IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 19, 2021

## MATTHEW REYNOLDS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 41400813          Jill Bartee Ayers, Judge**

_____

## No. M2020-01587-CCA-R3-PC

_____

The Petitioner, Matthew Reynolds, appeals the denial of post-conviction relief from his convictions for first degree premeditated murder, first degree felony murder, and especially aggravated kidnapping, arguing that his trial counsel was ineffective for not properly investigating the case and not requesting a sequestered jury, a change of venue, and a severance from his co-defendants. Based on our review, we affirm the judgment of the post-conviction court denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Matthew Lee Reynolds.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; and Robert J. Nash, District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The Petitioner and three co-defendants, Alphonso Richardson, Cynthia Dianne Skipper, and Derek Vicchitto, were indicted by the Montgomery County Grand Jury for first degree felony murder, first degree premeditated murder, especially aggravated kidnapping, and three counts of aggravated sexual battery based on their June 26, 2014 actions in hanging their housemate, Shirley Beck, by her arms from the ceiling and beating

her to death. All four were tried together before a Montgomery County jury. The trial court dismissed the aggravated sexual battery counts at the conclusion of the State's proof, and, following deliberations, the jury found the Petitioner and his three co-defendants guilty of especially aggravated kidnapping, the Petitioner and Co-Defendant Richardson guilty of felony and premeditated murder as charged in the indictment, Co-Defendant Skipper guilty of two counts of criminally negligent homicide, and Co-Defendant Vicchitto guilty of two counts of facilitation of second degree murder. In his direct appeal, the Petitioner argued that the evidence was insufficient to sustain his convictions. This court affirmed the convictions but remanded to the trial court for entry of completed judgments reflecting the sentences imposed for the merged first degree murder convictions. Our supreme court denied the Petitioner's application for permission to appeal. State v. Matthew Reynolds, et al, No. M2017-00169-CCA-R3-CD, 2018 WL 6253829, at *1-6 (Tenn. Crim. App. Nov. 28, 2018), perm. app. denied (Tenn. Apr. 11, 2019).

Our direct appeal opinion reveals that the Petitioner and his co-defendants relied for their defense on the victim's voluntary participation in the "BDSM" lifestyle, in which individuals engage in bondage and discipline, dominance and submission, and sadism and masochism. Id. at *1, n. 1. At trial, Twila Ours, an "established BDSM mistress," testified that the victim entered into a contract with her in November 2013 in which the victim agreed to serve as her "house slave." Id. at *1. "[T]he victim lived with and 'belong[ed]' to [Ms. Ours],'" and "Ms. Ours served as 'payee' for the victim's disability payments, managed the victim's finances, and disciplined the victim pursuant to her status as house slave." Id. According to Ms. Ours, "the victim sought pleasure through discipline and pain[.]" Id.

In May 2014, Ms. Ours sent the victim to serve as house slave in the Clarksville home of Ashley Laughlin, who was the surrogate daughter of Mrs. Ours and who was recovering from surgery. Id. The Petitioner, his three co-defendants, and Kristin Wilkerson all lived in the home as well. Id. During the six weeks the victim lived at the home, "[Co-Defendant] Skipper served as the victim's mistress and was in charge of disciplining her, while [Co-Defendant] Vicchitto participated as a switch." Id. As a "switch," Co-Defendant Vicchitto could take either a dominant or a submissive role, depending on his mood. Id. at *1, n. 2. Although Co-Defendants Skipper and Vicchitto were engaged in the BDSM lifestyle, the Petitioner and Co-Defendant Richardson were not. Id. at *1.

The "discipline" session that resulted in the victim's death began around midnight on June 26, 2014, after Co-Defendant Richardson accused the victim of trying to poison him and Ms. Laughlin by placing boric acid in their drinking cups. Id. at *2. On Co-Defendant Skipper's orders, "the victim was initially hung by her arms from an eyebolt nailed to the ceiling and beaten in [Co-Defendant] Skipper's bedroom." Id. In order to

avoid damaging the electronics in the bedroom, the victim was then moved to the living room, where she was again hung from the ceiling by her arms while the Petitioner, Co-Defendant Richardson, and Co-Defendant Vicchitto took turns beating her. Id.

Over the course of four hours, the victim was savagely beaten by the Petitioner and Co-Defendants Richardson and Vicchitto. Id. at *2-3. A gag was placed in her mouth, and the victim could be heard groaning and moaning as she was beaten. Id. at *2. When the victim lost consciousness, the Petitioner and Co-Defendant Vicchitto revived her by running cold water over her in the shower before hanging her back up by her arms for a continuation of the beating. Id. "After the victim's second and third loss of consciousness, only [Co-Defendant] Richardson resumed beating her." Id. Approximately three and one-half hours into the beating, the victim was very weak and unable to stand or talk. Id. At that point, the Petitioner and Co-Defendants Vicchitto and Skipper "urged [Co-Defendant Richardson] to stop beating the victim, but he refused." Id.

Ms. Wilkerson, who witnessed the beating while seated at the dining room table, testified that she saw the Petitioner "strike the victim '[w]ith his feet, wrists, arms, knees, shins and feet' in what 'appeared to be a series of martial arts moves.'" Id. at *2. The Petitioner "kicked the victim 'more than 50' times in 'her waist, torso, and legs.'" Id. Ms. Laughlin, who woke sometime after the beating began but went back to bed between 1:30 and 2:00 a.m., testified that she saw Co-Defendant Richardson enter the living room with a metal pole and then heard three loud, bone-shattering cracks. Id. Afterwards, the Petitioner and Co-Defendant Vicchitto took the victim down from the hook, removed her gag, and placed her in the shower under cold water in order to revive her. Id. During that time, "[t]he victim told Ms. Laughlin 'she felt like she was going to pass out.'" Id.

When the victim lost consciousness for the final time and could not be revived, Co-Defendant Vicchitto called 911. Id. at *3. Before the police arrived, Co-Defendant Vicchitto, Co-Defendant Skipper, and Ms. Wilkerson concocted a story of having found the victim on the side of the road after she had been assaulted by strangers. Id. The Petitioner, who left the home before the 911 call, was located by the police with Co-Defendant Richardson at a nearby laundromat at approximately 2:20 p.m. that same day. Id. at *3-4. The subsequent autopsy of the victim's body revealed that the cause of death was "multimodality trauma by beating and strangulation." Id. at *5. The victim had multiple bruises, abrasions, and broken bones, including thirteen broken ribs, a fractured sternum, a torn liver, bruised intestines, and internal bleeding. Id.

On November 26, 2019, the Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of post-conviction counsel, he filed an amended petition in which he alleged that his trial counsel was ineffective for failing to properly investigate the case, failing to request that the jury be sequestered, and failing to

request a change in venue. At the beginning of the evidentiary hearing, post-conviction counsel alleged that trial counsel was also ineffective for his failure to pursue a severance of the Petitioner's trial from his co-defendants.

The Petitioner testified that his appointed counsel met with him only three or four times before trial, for only thirty-five or forty minutes each session. He said trial counsel only briefly reviewed with him the facts of the case. Trial counsel talked with him about whether he should testify and told him that it would probably not be a good idea because of the number of co-defendants in the case. The Petitioner testified that he had a criminal record, consisting of some marijuana charges and a violation of probation and had just been released from jail twenty-six days before the victim's death. However, he and trial counsel never discussed his criminal history.

The Petitioner testified that he thought being tried in Clarksville hurt him because it was such a high-profile case. He said that information about the case was everywhere and that it would have been impossible for Clarksville residents to avoid hearing details about the case. He thought that jurors from a different venue, not exposed to the pretrial publicity and public gossip, would have been less biased. He conceded that jurors from a different venue might not have viewed the disturbing facts any differently from Clarksville jurors, but he nonetheless believed that trial counsel should have requested a change in venue. He said when he asked trial counsel about requesting a change in venue, counsel told him that it probably would not happen. He did not know if trial counsel ever filed a motion for a change of venue.

The Petitioner testified that he had no knowledge of whether trial counsel ever hired an investigator. He said he had been assigned to live at the residence as part of his probation and had wanted to leave, but his probation officer told him that he had to secure another place to live first. Therefore, on the day before the incident, he called both his mother and a man who was like his uncle to ask if he could move in with either of them. He was unable to reach his uncle, but he spoke with his mother. He told trial counsel about his conversation with his mother, mentioned that she would be a good character witness, and gave trial counsel her contact information. Although trial counsel spoke with her, he did not call her as a witness.

The Petitioner testified that he wanted trial counsel to investigate the several different statements that Ms. Wilkerson had made, as well as the fact that she was not charged with any crime. He acknowledged that trial counsel cross-examined Ms. Wilkerson about whether she was receiving a deal in exchange for her testimony, and that she replied that she was not. He could not recall if trial counsel cross-examined her about her different statements.

- 4 -

The Petitioner also thought that trial counsel should have investigated and introduced at trial the fact that he was severely intoxicated at the time he gave his statement to police, the lack of bruises or redness on his hands and knuckles, and the different occasions in the past that the police had been called to the residence based on domestic violence complaints against Co-Defendant Richardson. The Petitioner testified that he had only recently found out about the episodes of domestic violence committed by Co-Defendant Richardson against Ms. Laughlin. He thought, however, that trial counsel could have discovered them had he conducted an adequate investigation of the case.

The Petitioner testified that he told trial counsel several times that he wanted a separate trial from his co-defendants. He acknowledged that trial counsel filed a motion to sever and said that trial counsel told him the motion had been denied. He did not know if trial counsel ever argued the motion. He believed he was prejudiced by the joint trial because there was no DNA evidence linking him to the crime, yet he was linked to the actions of his co-defendants, of which he had no part. He expressed his belief that he could not "get a fair trial . . . with three other people getting accused of stuff and [his being] mixed into it[.]" Had he been tried separately and not subject to cross-examination by so many different criminal defense attorneys, he would have chosen to testify in his own defense. He explained that, had he testified at the joint trial, the other defense attorneys could have engaged in deception by crafting their questions to get the answers they wanted. He acknowledged he would have been subject to cross-examination by the State if he was tried alone but said he would have still chosen to testify because he would have felt more comfortable in a trial without his co-defendants.

On cross-examination, the Petitioner acknowledged that trial counsel explained the charges and potential punishments he faced and never guaranteed him any particular outcome in the trial. He agreed that it was his decision not to testify in his own defense but said he made the decision based on trial counsel's advice. He denied having given a statement in which he said that he had kicked and punched the victim. He agreed that his statement was not introduced at trial. Finally, he acknowledged that he did not have any news articles in support of his claim of the extensive pretrial publicity in the case.

Linda Johnson, the Petitioner's mother, testified that she spoke with trial counsel many times, telling him what she knew of the Petitioner and what transpired in the home, but trial counsel told her he would not call her as a witness. She also gave trial counsel a list of other potential witnesses, including "Lavette," the girl that the Petitioner had been dating, the neighbors in a nearby apartment who had called for a welfare check at the residence on the day before the incident, and the manager of the apartment complex. She did not know if trial counsel ever contacted those individuals. Had she been called as a witness, she would have told the jury that the Petitioner, a manic depressive, had been in a vulnerable position without money, food, or access to his mental health medication, and

that he had called to tell her of his desire to get out of the home because the other residents were engaged in crazy behavior.

Ms. Johnson stated that she provided all the above information to trial counsel. Other than telling her that it did not really matter, trial counsel gave no explanation for not calling her as a defense witness. On cross-examination, Ms. Johnson acknowledged that she lived in Georgia and had no firsthand knowledge of any of the events.

Trial counsel testified that he had been licensed to practice law since October 2007, had worked for the Davidson County Public Defender's Office for approximately three and a half years, and had started his own law firm in 2011, where he practiced exclusively criminal defense law. He estimated that he had handled between eighty to one hundred criminal trials, including at least fifteen murder trials, during his practice. He stated that he began his representation of the Petitioner in 2014. Based on his records, he met with the Petitioner fourteen times at the jail during the course of his representation. In addition, his clients were able to reach him on his cell phone when they called from the jail.

Trial counsel testified that he had never requested a sequestered jury during his career, and said that, in his experience, clients always believed that their own cases were more newsworthy than they actually were. He was unaware of any pretrial publicity in the Petitioner's case and did not believe the case met the standard for a change in venue. He stated that the victim was not a prominent figure in the community and had not lived in Clarksville for very long. He acknowledged it was possible that local newspapers might have covered the crimes when they first occurred but said that there was a significant gap between the crimes and the trial and he had no knowledge of any publicity during the trial. Even in hindsight, he would not have asked for a sequestered jury or a change in venue because he did not believe either would have been granted.

Trial counsel testified that he filed a motion to sever, but after the prosecutor announced that he was not going to use the co-defendants' statements at trial, the Bruton issue on which he had relied for the motion was eliminated. Trial counsel stated that he kept the Petitioner informed of everything he did in the case and would have discussed the issue with the Petitioner. He conceded the Petitioner may have told him that he did not want to be tried with his co-defendants but said that, without the Bruton issue, he had no good faith grounds to proceed with the motion.

Trial counsel had no memory of either the Petitioner's or the Petitioner's mother's providing him with a list of potential witnesses, but he said it was possible they did. He did not hire an investigator because he was aware of all the facts, and an investigator was unnecessary. He spoke periodically with the Petitioner's mother, but she did not have any relevant information to add to the case. He, likewise, did not think that the information the

potential other witnesses could have allegedly provided would have been relevant or admissible at trial. Trial counsel testified that everyone was aware that Co-Defendant Richardson had a prior domestic assault. He said he tried everything he could to blame the victim's death on Co-Defendant Richardson, who was, from the testimony, clearly "not a nice person."

Trial counsel testified that he was aware of the prior inconsistent statements by Ms. Wilkerson, and he argued to the jury that she was an accomplished liar who should not be believed. He also extensively cross-examined the other eyewitness, Ms. Laughlin, who admitted at trial that she was legally blind.

On cross-examination, trial counsel testified that he not only reviewed with the Petitioner the charges and potential punishments, but he also included in the written case summary he provided the Petitioner an itemization that showed the potential punishments for each charge. He advised the Petitioner against testifying because of the number of co-defendants, the difficulty in preparing for cross-examination from multiple parties, and the possibility that the co-defendants' counsel could bring up the Petitioner's admissions in a separate trial. The Petitioner did not want to testify, and it was his decision not to take the stand.

Trial counsel testified that he reviewed the video tape of the Petitioner's statement to police and prepared a transcript of the statement, which he shared with the Petitioner. He said the Petitioner had slept during the long gap between his arrest and his statement and was not intoxicated when he gave the statement. In the detailed statement, the Petitioner admitted that he had struck the victim, physically demonstrated the punches and kicks he had used, and talked about his knowledge of karate.

On November 18, 2020, the post-conviction court entered a written order in which it concluded that the Petitioner failed to establish that he was denied the effective assistance of counsel because he failed to prove by clear and convincing evidence his allegations of deficient performance of counsel. Among other things, the court noted that the Petitioner presented no proof of pretrial publicity or difficulty in seating jurors who were without prior knowledge of the case, failed to present any witness other than his mother, who had no knowledge of the crimes, and failed to show any basis for a severance of trial after the State opted not to introduce the statements of the co-defendants. Accordingly, the post-conviction court denied the petition for post-conviction relief.

## ANALYSIS

On appeal, the Petitioner cites his own evidentiary testimony about the level of pretrial publicity generated by the case to argue that, if his testimony is accredited, trial

counsel was deficient in his performance for not properly investigating the case, not requesting a sequestered jury, and not requesting either a change in venue or severance of trial. He argues that trial counsel's alleged deficiencies resulted in prejudice because he was deprived of an untainted jury and a fundamentally fair trial. The State argues that the post-conviction court properly denied the petition because the Petitioner was unable to show either a deficiency in counsel's performance or prejudice to his case.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). We apply the Strickland test to claims of ineffective assistance of trial counsel as well as ineffective assistance of appellate counsel. Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)).

The burden in a post-conviction proceeding is on the petitioner to prove allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

The post-conviction court denied the petition after finding that the Petitioner failed to meet the deficiency prong of his ineffective assistance of counsel claim. The record fully supports the findings and conclusions of the post-conviction court. Other than his own testimony, the Petitioner presented no proof of any pretrial publicity in the case, difficulty in impaneling a jury, or witnesses that trial counsel failed to discover who might have had relevant and admissible testimony for the defense. Trial counsel's testimony, which was obviously accredited by the post-conviction court, established that he met with the Petitioner on multiple occasions, kept the Petitioner informed of the charges, the potential punishments, and the progress in the case, and was fully prepared for trial. Trial counsel was unaware of any pretrial publicity, saw no reason to file a motion for a sequestered jury or a change in venue, and did not believe he would have had success with either motion. Trial counsel also explained that he had no good faith argument for the motion to sever after the Bruton issue was resolved and said that he did not know of any relevant and admissible evidence that could have been provided by either the Petitioner's mother, or any potential witness mentioned by the mother at the evidentiary hearing. We agree with the post-conviction court that the Petitioner failed to meet the deficiency prong of his ineffective assistance of counsel claim. We, therefore, affirm the denial of the petition for post-conviction relief.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE